## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MARK CRAMER, JAMES M.
GRANT, WILLIAM TOMPKINS,
JANET K. O'NEILL, CENTRAL
PROPERTY DEVELOPMENT, INC.,
THE SOUTHBY PARTNERSHIP,
LTD., MICHAEL W. MALONEY and
D.J. MAHONEY CO.,

      Appellants,

v.                                                    Case No: 8:18-cv-1026-CEH

PALM AVENUE PARTNERS, LLC,
THOMAS E. LEITER, MATTHEW T.
LEITER, THE LEITER GROUP, LLC,
BEACON HOMES OF FLORIDA,
LLC and THE LEITER GROUP,
ATTORNEYS AND COUNSELORS,
P.C.,

      Appellees.

_____

## <u>ORDER</u>

This cause comes before the Court on three consolidated appeals from a final

judgment and a number of post-trial orders issued by the United States Bankruptcy

Court for the Middle District of Florida, Tampa Division ("Bankruptcy Court")

following a four-day bench trial.[1] Appellants filed an initial brief (Doc. 52), Appellees

filed a response and their own initial brief on cross-appeal (Doc. 59), Appellants filed

---

[1] Before consolidation, the appeals had the following case numbers: (1) 8:20-cv-00040-CEH;
(2) 8:21-cv-01353-CEH; and (3) 8:17-cv-02060-CEH.

a reply brief and response to the cross-appeal (Doc. 66), and Appellees filed their reply brief as to the cross-appeal (Doc. 69).  The Court heard oral argument in this matter. Doc. 78.

Upon due consideration of the record, the Parties' submissions, oral argument and otherwise being fully advised in the premises, the Bankruptcy Court's final judgment and related orders will be affirmed-in-part, vacated-in-part, and remanded to the Bankruptcy Court for further proceedings as detailed herein.

## I.    BACKGROUND

In light of the voluminous record and number of orders on review, including over ninety pages of Findings of Fact and Conclusions of Law (*see* Docs. 47-268, 47-311), a brief summary of the background facts, relevant orders, and proceedings at trial is provided at the outset.

### A. Palm Avenue Partners, LLC

Appellant Thomas Leiter is a real estate attorney and litigator with extensive experience as a lawyer, developer, and practitioner in the areas of historic preservation and real estate.[2] Doc. 47-265 at 161–163. He created and managed Palm Avenue Partners, LLC, a real estate development entity formed to purchase two adjacent

---

[2] The Bankruptcy Court found in its First Findings of Fact and Conclusions of Law ("First Findings") and ultimately its final judgments, that of the seven defendants, "only Tom Leiter and Palm Avenue Partners could be liable." Doc. 47-268. Thus, for ease and clarity, Appellants will be referred to as "Leiter" throughout this Order.

properties in downtown Sarasota and construct an 18-story high rise condominium with retail, parking, offices, and residences. Doc. 46-139 at 7; Doc. 47-267 at 3–4.

Leiter decided to raise money for the venture from outside investors, including the Appellees (seven investors in Palm Avenue), through a Private Placement Memorandum ("PPM"). Doc. 46-139. The PPM represented that Leiter paid $3,725,000 to acquire the property. And a "Project Financial Pro Forma" in the PPM listed the costs of acquiring the property and other projected expenses as follows (Doc. 46-139 at 9–10):

> Land Acquisition and Related Costs: $3,725,000.00
> Construction and Related Costs: $17,937,500.00
> Contingencies: $1,255,625.00
> Legal, accounting & project management: $850,000.00
> Construction Interest: $1,050,000.00
> Total Cost: $24,818,125.00.

However, as investors in the project would discover years later, the true costs of the land acquisition were not as simple as the PPM made them seem.

In fact, the property's prior owners agreed to sell the property to Howard Rooks for $2,200,000, from whom Leiter purchased the right to buy the property in exchange for a $300,000 promissory note and interests in Palm Avenue. *See* Doc. 46-151. Leiter, rather than assigning this contractual right directly to Palm Avenue, hatched a plan to form a separate entity, Beacon Homes of Florida, LLC, and acquire the interest in its name first. Docs. 46-136, 46-137. Only then did Palm Avenue, also controlled by Leiter, "agree" to acquire the right to buy the property in consideration for $1,300,000 (composed of a $300,000 promissory note payable to Rooks in one year and a

$1,000,000 promissory note payable on demand to Beacon). Doc. 46-138; Doc. 47-264 at 173–175; Doc. 46-151; Doc. 46-150. Leiter, perhaps not coincidentally, made sure that Palm Avenue paid out on the promissory note to Beacon in full. Doc. 46-185 at 1. This $1,000,000 payment to Beacon is herein referred to as the "Beacon Homes Payment" and Leiter's failure to disclose the payment, and therefore the true cost of the property, served largely as the basis for the Investors' claims.

Palm Avenue never broke ground. The plaintiffs below, seven of the sixteen investors in Palm Avenue,[3] sued Leiter, Palm Avenue, and several other Defendants in state court in 2011 for damages arising out of the failed project. Doc. 46-21. Palm Avenue filed bankruptcy and removed the state court case to the Bankruptcy Court the next year. Doc. 46-18. At trial, the operative complaint asserted twenty-one counts including fraud, negligent misrepresentation, breach of fiduciary duty, negligence, breach of oral contract, and civil conspiracy. Doc. 46-99. Ten counts were brought in the Investors' individual capacities and the other eleven were brought as derivative claims. *Id.*

The Bankruptcy Court conducted a four-day trial, after which each party submitted proposed findings of fact and conclusions of law. The Bankruptcy Court then entered its First Findings, which noted that the Investors had abandoned all but their direct and derivative breach of fiduciary duty and misrepresentation claims at trial. Doc. 47-268 at 12. The First Findings held that the Investors had proven their

---

[3] For ease of reference, Plaintiffs at trial below (now the Appellees/Cross-Appellants in this proceeding) will be referred to as the "Investors."

fraudulent misrepresentation claim (Count Two), awarded them the return of their entire investments based on this count, and declined to make findings as to any other claims due to the "more complicated and novel legal issues" surrounding those claims. *Id.* at 12–13. Supplemental briefing was submitted on interest calculations and proposed final judgments, and the Bankruptcy Court entered its First Final Judgment against Leiter and Palm Avenue and in favor of the Investors on Count Two (Fraudulent Misrepresentation), awarding the Investors the return of their entire respective investments. Doc. 47-285.

Leiter filed an Amended Notice of Appeal appealing both the First Findings of Fact and the first Final Judgment, and the Investors filed a Notice of Cross-Appeal of the first Final Judgment (Doc. 47-288; Doc. 1). Leiter and the Investors also moved to alter or amend the first Final Judgment. Docs. 47-292, 47-296. Leiter argued that the first judgment was not final because it did not dispose of all claims, and the Investors argued that it should be amended to award additional damages to two investor-plaintiffs. Both Parties sought attorneys' fees pursuant to competing offers of judgment, and the Defendants (other than Leiter) sought costs, claiming that they were in fact the prevailing parties. Nine months after the First Final Judgment, the Bankruptcy Court entered a Second Findings of Fact and Conclusions of Law (Doc. 47-311) as to the counts that were unresolved. It found Leiter liable for the Investors' direct claims for breach of fiduciary duty and negligent misrepresentation (Counts 1 and 3), and liable to Palm Avenue itself on the derivative claims for breach of Fla. Stat. § 608.4225 (Count 20) and usurpation of a corporate opportunity (Count 21).

A year later, the Bankruptcy Court entered an order on the Parties' motions to alter or amend the judgment, motions for fees, and Defendants' motion for costs. Doc. 46-7. Defendants' motion to alter or amend was granted and the Court stated that it would enter a final judgment that addressed all claims. *Id.* at 6. The Investors' request to award additional damages to two investors was denied, as the Bankruptcy Court found that awarding such damages would require it to disregard the corporate form. *Id.* at 6. Both motions for attorneys' fees and Defendants' motion to tax costs were denied. *Id.* at 7–10. The Bankruptcy Court also entered a corresponding Amended Final Judgment. Doc. 47-8.

### B. The Bankruptcy Court's First Findings of Fact and Conclusions of Law (Doc. 47-268)

The Bankruptcy Court found that Leiter's failure to disclose nearly $1 million of investment money that went to Beacon Homes, and $400,000 he paid his management company and law firm for services "supposedly provided" was material to the Investors' decision to invest in Palm Avenue. Doc. 47-268 at 2. The Bankruptcy Court also found that Leiter owed an implied fiduciary duty to disclose the $1.4 million in payments to himself based on prior personal relationships with most of the Investors, as well as based on his partial disclosure of material facts and superior knowledge of the transactions. *Id.* at 2–3. As the evidence showed that Leiter fraudulently failed to disclose these facts in violation of his duty, the Court found that the Investors had met their burden of proof on their fraudulent concealment claim. *Id.* at 3.

Additionally, the Bankruptcy Court found that Leiter's standing and statute of limitations defenses did not preclude entry of final judgment. *Id.* at 31. Specifically, it found that the Investors had standing to bring their fraud claim directly because they each sought to remedy a wrong caused by the fraudulent concealment (the loss of their investments), rather than remedy a wrong to Palm Avenue Partners, as argued by Leiter. *Id.* at 31–35. The Bankruptcy Court found that the statute of limitations had not run on the claims either because there was no evidence the Investors should have known of the fraud. Moreover, it found that the Investors tried to inspect Palm Avenue's books and records, but Leiter did not turn them over in a timely fashion. *Id.* at 35–38. Because they could not have discovered the fraudulent concealment until April 2009, the Court concluded that the fraudulent concealment claim was not time-barred. *Id.* at 38. Finally, it noted that because each Investor invested different amounts at different times, a hearing would be held to determine the proper amount of prejudgment interest. *Id.* at 40.

### C. The Bankruptcy Court's Second Findings of Fact and Conclusions of Law dated December 17, 2019 (Doc. 47-311)

This order addressed Counts 1 & 3–21. Doc. 47-311 at 1. The Court noted that it had already determined that the plaintiffs were entitled to the full return of their investment based on Leiter's fraudulent concealment. *Id.* at 2.

The remaining claims alleged breach of fiduciary duty (Counts 1 & 11); fraudulent and negligent misrepresentation (Counts 3–7, 12–14, and 16); equitable accounting (Counts 8 & 18), conspiracy (Counts 9 & 19), breach of section 608.4225,

Florida Statutes (Counts 10 & 20), breach of contract (Counts 15 & 17), and usurpation of a corporate opportunity (Count 21). *Id.* at 9. Some were asserted in a direct capacity (Counts 1 & 3–10), and others in a derivative capacity (Counts 11–21). *Id.*

The Court concluded that Leiter was liable to the Investors for negligent misrepresentation based on his concealment of the $1 million fee he paid to his own company for serving as a "straw man," breach of fiduciary duty in his orchestration of the $1 million kick-back, and usurpation of a corporate opportunity because he arranged for Beacon Homes to acquire the land and resell it to Palm Avenue needlessly in order to extract the fee. *Id.* at 2–3. The Court found that the Investors had failed to meet their burden of proof on their claims for accounting, conspiracy, and breach of contract. *Id.* at 41–45.

### D. The Bankruptcy Court's Order on Various Post-Trial Motions (Doc. 46-7) and Corresponding Amended Final Judgment (Doc. 47-8)

The saga continued. Next, the Bankruptcy Court issued an order on a number of post-trial motions seeking to alter or amend the final judgment, tax costs, and award attorney's fees and non-taxable expenses. Doc. 46-7 at 1. Granting the defendants' motion, the Court ruled that it would address all the claims in an Amended Final Judgment in order to effectuate a truly final judgment. Doc. 46-7 at 5–6. It denied Investor Cramer's request for additional damages based on $100,000 he invested through his company, and Investor Southby's request for $100,000 in damages based on an investment made "through its owner." *Id.* at 6–7. The Bankruptcy Court found that Cramer and Southby were essentially asking it to disregard the corporate form by

awarding them the return of investments made by entities they owned, but had failed to provide any legal authority for that request. *Id.*

Separately, the defendants besides Tom Leiter (who clearly had not prevailed at trial), sought an award of taxable costs for being "prevailing parties", which the Court declined to grant them. It found that although the non-Leiter Defendants were technically "prevailing" parties, their costs were for expenses that benefited all the Defendants, including Tom Leiter, and awarding costs would result in the true prevailing party (the Investors) paying the non-prevailing party's costs. *Id.* at 8.

Finally, the Bankruptcy Court found that none of the parties were entitled to fees under their proposals for settlement because: Fla. Stat. § 768.79 does not apply to an action in which a plaintiff seeks both damages and equitable relief, the complaint here included equitable causes of action, and all proposals for settlement were directed to all the direct claims, including the equitable ones. *Id.* at 9–10.

### E. Issues on Appeal and Cross-Appeal

Leiter raises five issues on appeal. *See* Doc. 52. He contends that the Bankruptcy Court erred by: (1) awarding damages to the Investors on two derivative claims; (2) finding that he owed them a duty to disclose the Beacon Homes Payment (for three independent reasons); (3) finding that he made a material misrepresentation or omission with respect to the Beacon Homes Payment; (4) not dismissing the Investors' claims as time-barred; and (5) awarding the Investors speculative damages. On cross-appeal, the central issues are: (1) whether two Investors should have been awarded an additional $100,000 in damages notwithstanding the fact that one was an individual

investor who invested through a corporate entity and the other was a corporate investor who invested through a different company; and (2) whether the Investors were wrongfully denied attorney's fees. *See* Doc. 59 at 12–24.

## **STANDARD OF REVIEW**

District courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. 28 U.S.C. § 158(a). This Court functions as an appellate court in reviewing decisions of the bankruptcy court. *See In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). Legal conclusions of the bankruptcy court are reviewed *de novo* and findings of fact are reviewed for clear error. *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009).

When reviewing a bankruptcy court's decision, "the district court . . . is [not] authorized to make independent factual findings." *In re Sublett*, 895 F.2d 1381, 1384 (11th Cir. 1990). The district court must instead accept the bankruptcy court's factual findings unless they are clearly erroneous. *In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Morrisette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (citations and quotation marks omitted). The burden of showing clear error falls on the party seeking to overturn a bankruptcy court's finding. *See In re Caribbean K Line, Ltd.*, 288 B.R. 908, 911 (S.D. Fla. 2002).

Although an appellate court will not overturn a bankruptcy court's factual findings unless the findings are clearly erroneous, Bankruptcy Courts must follow Rule 52, Federal Rules of Civil Procedure, in conducting adversary proceedings and trials. *Holloway v. John Hancock Mut. Life Ins. Co. (In re Holloway),* 81 F.3d 1062, 1066 n. 5 (11th Cir. 1996) (citing Fed. R. Bankr. P. 7052). Rule 52 requires that "facts be found specifically and that the conclusions of law be stated separately." *Bavaro Palace, S.A. v. Vacation Tours, Inc.,* 203 Fed. Appx 252, 255 (11th Cir. 2006). *See generally Fed. Land Bank of Jackson v. Cornelison (In re Cornelison),* 901 F.2d 1073, 1075 (11th Cir. 1990).

Generally, "the court 'need only make brief, definite, pertinent findings and conclusions upon the contested matters.' " *Wachovia Bank N.A. v. Tien,* No. 13–11971, 598 Fed. Appx. 613, 617, 2014 WL 7399064, at *4 (11th Cir. Dec. 31, 2014) (quoting *Stock Equip. Co. v. Tennessee Valley Auth.,* 906 F.2d 583, 592 (11th Cir. 1990)). The purpose of the exacting requirements of Rule 52 "is to 'provide a sufficiently definite predicate for proper appellate review.'" *Bavaro Palace,* 203 Fed. Appx. at 255 (quoting *Hydrospace–Challenger, Inc. v. Tracor/MAS, Inc.,* 520 F.2d 1030, 1033–34 (5th Cir. 1975)). Upon a finding that the trial court failed to meet the Rule 52 standard, this Court may not engage in finding new facts to support or to diminish the district court's legal conclusions. *See United States v. Barnette,* 10 F.3d 1553, 1556 (11th Cir. 1994) (stating that "an appellate court does not find facts"). Instead, "[i]f the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court . . . must remand the case to the bankruptcy court for the necessary factual determination." *In re JLJ Inc.*, 988 F.2d at 1116.

On state law issues, this Court is bound by decisions of the Florida Supreme Court. *Ounjian v. Globoforce, Inc.,* 89 F.4th 852, 857–58 (11th Cir. 2023). When the Florida Supreme Court has not spoken, this Court must follow decisions of Florida's intermediate appellate courts, "absent some persuasive indication that the state's highest court would decide the issue otherwise." *Id.* (quoting *Pincus v. Am. Traffic Sols., Inc.,* 986 F.3d 1305, 1310 (11th Cir. 2021)).

## III.   ANALYSIS

**Leiter's Appeals**

### A. <u>Damages on Counts 20 and 21 (Derivative Claims)</u>

First, the Court will address an issue the Parties largely agree on—that the Bankruptcy Court erroneously awarded damages to *individual* investors based on two *derivative* claims brought on behalf of Palm Avenue. *See* Doc. 47-8 at 2.

Leiter contends that the Investors were not entitled to damages on Count 20 (breach of statutory fiduciary duty) or 21 (usurpation of corporate opportunity), because they were brought derivatively on behalf of Palm Avenue. Doc. 52 at 18. He notes that the Amended Final Judgment ordered that the Investors "prevailed and are entitled to recover from Defendants . . . all amounts they each invested, plus interest, on Counts . . . XX, and XXI of the Fourth Amended Complaint." Doc. 47-8 at 2.

Further, Leiter points out that the Bankruptcy Court expressly found that these claims belong to the bankruptcy estate, so any liability would be to Palm Avenue itself. *See* Doc. 47-311 at 20. Thus, to the extent the Bankruptcy Court awarded damages to

the Investors on Counts 20 and 21, Leiter argues that the Amended Final Judgment must be reversed. Moreover, in light of the fact that the Bankruptcy Court did not provide a damages figure as to these two counts (instead finding that the Investors were entitled to the full return of their investments on these counts in addition to Counts 1, 2, and 3) he argues there is no basis in the record for this Court to establish the amount of damages owed to Palm Avenue. Doc. 52 at 19.

The Investors agree that Palm Avenue itself should have been awarded damages on Counts 20 and 21. Doc. 59 at 24–26. However, they argue that enough evidence is in the record for this Court to establish the proper amount. Specifically, they argue that the record clearly shows that Palm Avenue suffered $1,000,000 in damages due to Leiter's self-dealing Beacon Homes Payment. They point out that the Bankruptcy Court concluded that "Tom Leiter should have to account to Palm Avenue Partners for the $1 million benefit he derived from the payment he arranged for Palm Avenue Partners to make. The Investors are therefore entitled to final judgment in their favor on Count 20." Doc. 47-311 at 32. Based on the finding that Leiter should "have to account" to Palm Avenue, the Investors ask this Court to remand and instruct the Bankruptcy Court to amend the Amended Final Judgment to provide for $1,000,000 in damages to Palm Avenue on these counts. Doc. 59 at 26.

On reply, Leiter argues that the Investors did not properly preserve or appeal the Bankruptcy Court's failure to award damages to Palm on the derivative counts and this Court cannot determine the proper amount. Doc. 66 at 33–36. He asserts that the

Court should reject their request to remand with instructions to award a specific damages amount based on the fact that there is no basis in the record for it. *Id.* at 27.

Generally, the Parties are both right. The Amended Final Judgment erroneously stated that the Investors should recover the entirety of their investments on two derivative counts that should have resulted in damages for Palm Avenue, the entity on behalf of which they were brought. The Bankruptcy Court thus erred in awarding damages to the Investors on Counts 20 and 21.

However, neither the Amended Final Judgment, nor the First or Second Findings provide a specific and reasonably certain damages calculation. Therefore, the Court agrees with Leiter that the Amended Final Judgement should be reversed, and that it would be improper for this Court to calculate the proper amount of damages due, which was not done in the first instance.[4] Thus, the Amended Final Judgment (Doc. 47-8) is vacated-in-part, to the extent it awarded damages to the Investors on Counts 20 and 21. On remand, the Bankruptcy Court should determine the proper amount of damages suffered by Palm Avenue based on the claims in Counts 20 and 21 and enter an amended final judgment consistent with this Order.

### B. Duty to Disclose

Next, Leiter argues that the Bankruptcy Court erroneously found that he had a duty to disclose the Beacon Homes Payment to the Investors. Doc. 52 at 20. He

---

[4] Another reason that it would be improper for this Court to ascertain the proper amount of damages owed to Palm Avenue is that the Bankruptcy Court found that Leiter loaned $538,000 to Palm Avenue, as Leiter (and the Second Findings) note. Doc. 66 at 29; Doc. 47-311 at 30.

contends that this incorrect ruling led to the Court improperly finding in favor of the Investors on their claims for breach of fiduciary duty (Count I), fraudulent misrepresentation (Count II) and negligent misrepresentation (Count III) and that the Amended Final Judgment must be reversed. *Id.* at 34.

The Investors respond that the Bankruptcy Court was right to find that Leiter owed them a duty to disclose the Payment. *See* Doc. 59 at 26–44. As detailed in this section, one of the Bankruptcy Court's three grounds for finding that Leiter had a duty to disclose—his implied fiduciary relationship with the Investors—must be vacated because it failed to include sufficient and unambiguous findings such that this Court can meaningfully review its conclusion. This necessarily means that the Amended Final Judgment must be vacated as to Count 1, because the absence of a fiduciary relationship would necessarily mean Leiter could not have breached a fiduciary duty.

Nevertheless, the Amended Final Judgment will be affirmed as to Counts 2 and 3 based on one of the Bankruptcy Court's other reasons for finding a duty to disclose. In particular, this Court agrees that Leiter had a duty to disclose the Beacon Homes Payment based on his superior knowledge of the transaction (he himself set up the Payment), and because the Investors did not have an equal opportunity to become apprised of it. Leiter's arguments that the acquisition cost was in the public record and that the Investors could simply have inspected Palm Avenue's books and records both fail.

*Count I (Breach of Fiduciary Duty)*

15

The Court will begin with the issue of whether the Bankruptcy Court erred in finding that Leiter and the Investors had an implied fiduciary relationship.

In their complaint, the Investors alleged that Leiter breached his fiduciary duty to them by, *inter alia*, withholding material facts regarding the Beacon Homes Payment and therefore the property's actual purchase price. *See* Doc. 46-99 at 5–6. After the bench trial, the Bankruptcy Court found in both its First and Second Findings that Leiter owed the Investors an implied fiduciary duty and had a duty to disclose the actual purchase price of the property, which he did not.

Leiter argues that the Bankruptcy Court erred in finding that the Investors had provided evidence of a fiduciary relationship, and that reversal of this finding would necessarily mean the Investors could not prevail on Count 1. Doc. 52 at 22–30. He asserts that there was no evidence at trial to demonstrate a necessary element of an implied fiduciary relationship: that he accepted the trust the Investors reposed in him. Further, he argues that it relied on distinguishable caselaw to find that his personal relationships with several investors created a fiduciary relationship, and that the record shows that no individual Investor introduced sufficient facts to establish such a relationship. *Id.*

Leiter also argues that the Subscription Agreement disclaimed the possibility of any fiduciary relationship, because that agreement characterized the investment as risky, highly speculative, and stated that each investor should rely on individual advisors. *Id.* at 28. Leiter further argues that the Bankruptcy Court cited no evidence to support its finding that he accepted or even knew of the Investors' trust, and that

16

there is no legal basis for the conclusion that soliciting investments from friends, having superior knowledge regarding an investment, or disclosing some, but not all, information regarding a transaction is evidence of *acceptance* of trust sufficient to establish a fiduciary relationship. *Id.* at 29. Thus, Leiter argues that the Court erred in finding that he owed a fiduciary duty to the Investors. *Id.* at 30.

The Investors respond that the Bankruptcy Court's findings extensively analyzed the reasons that Leiter and the Investors had a fiduciary relationship in its First Findings (Doc. 47-268 at 22–26) and Second Findings (Doc. 47-311 at 22–27) and correctly found that they met their burden.

The First Findings noted that the Investors could prove Leiter accepted their trust expressly or impliedly and concluded that the facts of this case showed that Leiter had impliedly accepted their trust. Doc. 47-268 at 23. Later, when Leiter moved to alter or amend the Amended Final Judgment on the grounds that the Bankruptcy Court cited no evidence of him accepting the Investors' trust, the Court denied the motion. The Bankruptcy Court found that based on evidence of Leiter soliciting investments from friends and others familiar with his prior development projects, his superior knowledge of the land acquisition costs for the project, and his choice to disclose some of the information regarding the costs of the project while concealing the Beacon Homes Payment, it had not made a clear error of law or fact in finding that the Investors reposed their trust in Leiter and that he accepted that trust. Doc. 47-9 at 4–6.

On this issue, the Bankruptcy Court failed to adequately explain its reasons for finding that Leiter accepted the trust imposed in him by the Investors—a necessary element of an implied fiduciary relationship. Consequently, this Court will remand to the Bankruptcy Court for additional findings as to whether, and based on what evidence, Leiter accepted the trust placed in him by the Investors. Therefore, the Amended Final Judgment will be vacated-in-part as to Count One for further proceedings consistent with this opinion.

Before moving on, the Court will briefly reiterate the standard for implied fiduciary relationships under Florida law, recap the Bankruptcy Court's explanation for finding that the Investors had met their burden, and make note of a few nuances of this cause of action to be considered on remand.

Whether an implied fiduciary relationship exists hinges on "the specific facts and circumstances surrounding the relationship of the parties and the transaction in which they are involved." *Taylor Woodrow Homes Fla., Inc. v. 4/46–A Corp.,* 850 So. 2d 536, 540 (Fla. 5th DCA 2003) (citations omitted). In order to establish such a relationship, the plaintiff must prove both that she placed trust in the defendant and that the defendant accepted that trust. *Abele v. Sawyer,* 747 So.2d 415, 417 (Fla. 4th DCA 1999).

In its First Findings, the Bankruptcy Court noted that this issue was considered with respect to the specific facts of each transaction and concluded that the facts here were sufficient to create a fiduciary relationship. The Court cited *Bhayani v. Treeco, Inc.*, No. 2:09-cv-672-JES-DF, 2011 WL 250434 (M.D. Fla. Jan. 25, 2011) as an instructive

case, as well as for the proposition that a "fiduciary relationship may exist wherever one man trusts in and relies upon another." Doc. 47-268 at 23–26. It found that Leiter violated an implied fiduciary duty because the Investors, "like those in *Bhayani*, placed their trust in Leiter based on their years of friendship and [Leiter's] development experience and expertise." *Id.* at 24.

Citing trial testimony and evidence at length, the First Findings discussed Leiter's relationship with the Investors and their reasons for trusting him. Nowhere though did the Bankruptcy Court cite any evidence in support of its conclusion that Leiter *accepted* the trust of any Investor, nor did it delve any deeper into that key issue. Regardless, the Bankruptcy Court went on to conclude that "[e]ven if the Plaintiffs had not put their trust in Leiter, he still owed them a duty to disclose the $1 million Beacon Homes payment" for two other reasons. Therefore, the Bankruptcy Court found that the plaintiffs had met their burden on their fraudulent concealment claim and awarded them the return of their collective investment. *Id.* at 40.

The Bankruptcy Court had more to say about Leiter's implied fiduciary duty in its Second Findings, which it issued after determining that it had to rule on the remaining Counts, including the breach of fiduciary duty claim. *See* Doc. 47-311 at 22–27. It noted that the most difficult element for the Investors to establish in support of their breach of fiduciary duty claim would be the existence of a fiduciary relationship. *Id.* at 22. Again, citing *Bhayani*, the Bankruptcy Court found that the Investors placed their trust in Leiter based either on years of friendship with him or his development experience and expertise. *Id.* at 25. In finding a fiduciary relationship had

been proven, the Bankruptcy Court found that "regardless of whether the Investors had a prior personal relationship with Leiter or were relying on his apparent expertise, all (except one) testified they invested in the projected [sic] because they trusted Leiter. Based on those facts, the Court concludes the Investors proved the existence of a fiduciary relationship." *Id.* at 26. Again, no specific factual basis was given to support the conclusion that Leiter *accepted* the trust of any individual investor, or the investors collectively. *See* Doc. 47-311.

Finally, the Bankruptcy Court further elaborated on its reasoning for finding the existence of an implied fiduciary relationship when it denied Leiter's Motion to Alter or Amend the Final Judgment (Doc. 47-9). As the Bankruptcy Court summarized the record:

> Leiter sought investments from friends (one he had known for nearly a decade and another who was a fraternity brother, college roommate, and a friend of more than fifty years), as well as others who were familiar with Leiter's prior development project. He also had superior knowledge of the land acquisition costs for the condominium project—in particular, that he had arranged for a $1 million payment to a company he owned for serving as a straw man. And he chose to disclose some of the information regarding the land acquisition costs, while concealing the most relevant information—the $1 million straw fee. On those facts, the Court did not make a clear error of law or fact in concluding that the Plaintiffs reposed their trust in Leiter *and that Leiter accepted that trust*.

Doc. 47-9 at 5–6 (footnotes omitted).

Based on these factual findings and determinations, the Bankruptcy Court found that Leiter owed the Investors an implied fiduciary duty, and that it had not make a clear error of law or fact in finding that such a relationship existed. *Id.*

After careful review of the record, proper legal standard, and briefing, this Court cannot meaningfully review the Bankruptcy Court's determination that the Investors established the existence of an implied fiduciary relationship with Leiter. This is because the First and Second Findings were ambiguous as to the evidence supporting a finding that Leiter accepted the Investors' trust in him.[5]

Because of the fact-specific inquiry that must be conducted to determine whether a transaction rose to the level of an implied fiduciary relationship, including the requirement that courts determine not only whether one party has reposed trust in another party but also whether that party has accepted such trust (which often requires courts to assess the credibility of the parties involved), vacatur and remand on this issue is the appropriate remedy. *See In re Basil St. Partners, LLC,* No. 9:11-BK-19510-FMD, 2012 WL 6101914, at *23 (Bankr. M.D. Fla. Dec. 7, 2012) (discussing the elements of a claim for breach of implied fiduciary duty under Florida law). The existence of a fiduciary relationship is a question of fact, which is generally for the lower court to determine in the first instance. *See Trumpet Vine Invs., N.V. v. Union Cap. Partners I, Inc.,* 92 F.3d 1110, 1117 (11th Cir. 1996) ("The existence of a fiduciary relationship is a question of fact."); *Barnette,* 10 F.3d at 1556 (stating that "an appellate court does not find facts").

---

[5] For example, the First Findings stated no more on this point than that "the facts of this case are sufficient to create a fiduciary relationship." Doc. 47-268. And the second Findings added no more color to the conclusion that Leiter had accepted the trust reposed in him. *See* Doc. 47-311. Based on the law in Florida, this is not enough.

In remanding with instructions, the Court makes note of a few intricacies of implied fiduciary relationships. First, a defendant must accept the trust reposed to him in order to form an implied fiduciary relationship. *In re Basil St. Partners, LLC,* 2012 WL 6101914 at *23. To satisfy its burden on this element, a plaintiff must produce substantial evidence that the alleged fiduciary recognized, accepted, or undertook the duties of a fiduciary.[6]  *Amoco Oil Co. v. Gomez,* 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000); *Barnett Bank of W. Fla. v. Hooper*, 498 So.2d 923, 927 (Fla. 1986)

A fiduciary relationship cannot be unilateral. "The fact that one party places trust or confidence in the other does not create a confidential or fiduciary relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." *Identity Stronghold, LLC v. Zeidner*, 8:16-cv868-MSS-AAS, 2019 WL 12338322, *10 (M.D. Fla. Sept. 11, 2019) (quotations and modifications omitted); *see also Silver v. Countrywide Home Loans, Inc.*, 760 F.Supp.2d 1330, 1339 (S.D. Fla. 2011) ("[O]ne may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance

---

[6] Although the issue of whether a fiduciary relationship exists is a question of fact, *see Morton v. Young*, 311 So. 2d 755, 756 (Fla. 3d DCA 1975), a plaintiff cannot prevail by merely showing that he or she placed his trust and confidence in the defendant; the plaintiff must also introduce "substantial evidence" that the defendant "recognized, accepted, or undertook the duties of a fiduciary—that of advising, counseling, and protecting [the plaintiff]." *Amoco Oil*, 125 F. Supp. 2d at 509 (citing *Swerhun v. General Motors Corp.*, 812 F. Supp. 1218, 1223 (M.D. Fla. 1993); *Gilfus v. Mcnally Cap., LLC,* No. 8:18-CV-2941-CEH-CPT, 2022 WL 17582555, at *9 (M.D. Fla. Dec. 12, 2022).

of such duties, no fiduciary relationship is created"), *aff'd*, 483 F. App'x 568 (11th Cir. 2012).

Thus, it is an "indispensable condition" of an implied fiduciary relationship that there was some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party. *In re Sherwood Invs. Overseas Ltd., Inc.,* No. 6:10-AP-00158-KSJ, 2015 WL 4486470, at *16 (Bankr. M.D. Fla. July 22, 2015), *aff'd,* No. 6:15-cv-PGB-TBS, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016).

The First Findings explained that a "fiduciary relationship may exist wherever one man trusts in and relies upon another," and found that the Investors reposed trust in Leiter based on their personal relationships with him and/or his development experience. Doc. 47-268 at 23–26. Although the Bankruptcy Court also noted that the Investors had to prove "Leiter accepted that trust" or acquired it and then abused it, it added little to the issue of acceptance of trust beyond "conclud[ing] the facts of this case are sufficient to create a fiduciary relationship." Thus, the Bankruptcy Court left unclear the factual basis for its finding that Leiter accepted the trust reposed in him, and the Court is unable to properly review its ruling.

As already discussed, Florida law requires substantial evidence that an individual's trust was accepted in some way to create an implied fiduciary relationship. Thus, while the Bankruptcy Court detailed the evidence in support of its finding that each of the investors reposed trust in Leiter based on either a personal relationship or

Leiter's developmental expertise, it also should have discussed whether Leiter accepted the trust reposed in him.

Leiter maintains that the Bankruptcy Court found he owed the Investors an implied fiduciary duty despite the fact that no evidence was presented demonstrating that he accepted their trust. Doc. 52 at 29. He argues that the Bankruptcy Court misapplied caselaw and wrongfully treated the Investors as a group, rather than as individuals. *Id.* at 31. He also contends that the record evidence in fact shows no individual plaintiff proved facts necessary to establish a fiduciary duty. *Id.* at 31–35. In conclusion, Leiter argues that the Bankruptcy Court erred in finding that he owed a fiduciary duty to the Investors and that this Court should reverse the Amended Final Judgment. *Id.* at 37.

"When an appellate court discerns that a [lower] court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the [lower] court to make the missing findings." *Pullman–Standard v. Swint,* 456 U.S. 273, 291–92 ("[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." (citing *Kelley v. Southern Pacific Co.,* 419 U.S. 318, 331–32, (1974)).

The record here does not definitively permit only one resolution of the issue of whether the Investors established the existence of fiduciary relationships with Leiter. Therefore, the Court will remand this case to the Bankruptcy Court for additional factual findings as to whether Leiter accepted the trust of the Investors according to

the standard for implied fiduciary relationships under Florida law. *See, e.g., In re JLJ Inc.,* 988 F.2d at 1116. Thus, as to Count 1, the claim for breach of fiduciary duty, the Amended Final Judgment is vacated-in-part and the matter is remanded for further factual development on this issue and application of the proper standard. *In re Wisner,* No. 22-10073, 2023 WL 2706302, at *5 (11th Cir. Mar. 30, 2023) ("For the same reason, the bankruptcy court made no factual findings concerning the timing of the asset sale to Hairy & Baxter. Because the bankruptcy court's findings are ambiguous on these outcome-determinative factual questions, we must remand.").

*Count II (Fraudulent Concealment/Misrepresentation) and Count III (Negligent Misrepresentation)*

This Court's decision to remand with instructions on the issue of whether Leiter owed the Investors an implied fiduciary duty has no bearing on Counts 2 and 3, which do not depend on a finding that Leiter had or violated a fiduciary duty to the Investors.[7] That is so because the Bankruptcy Court provided two independent reasons for why Leiter had a duty to disclose the Beacon Homes Payment to the Investors.

---

[7] The Bankruptcy Court noted in one Order that even if it erred in finding that Leiter accepted the Investors' trust and thus owed them fiduciary duties, "Counts 2 and 3 would still stand. That's because the Court found that Leiter had a duty to disclose the $1 million straw fee not only because he owed a fiduciary duty to the Plaintiffs, but also because he chose to disclose some information about the land acquisition costs and because he had superior knowledge about—and the Plaintiffs had no ability to discover—the $1 million straw fee. Either of those findings was sufficient to support the Plaintiffs' fraudulent concealment and negligent misrepresentation claims." (Doc. 46-9 at 6 n.20)

The Bankruptcy Court found in favor of the Investors on Count 2, concluding that: (1) the payment to Beacon Homes was material; (2) Leiter had a duty to disclose it to investors; and (3) Leiter's failure to disclose the payment harmed the investors. Doc. 47-268 at 13–30. It found that Defendants had not contested any of the other elements of the cause of action. *Id.* at 14. It found that Leiter had a duty to disclose because: (1) he and the Investors had a fiduciary relationship; (2) he disclosed certain material facts, which meant that he had to disclose them all; and (3) the Investors did not have an equal opportunity to learn of the payment to Beacon Homes. Doc. 47-268 at 21.

The Court also found in favor of the Investors on the negligent misrepresentation claim in Count 3 based upon largely the same findings of fact and conclusions of law. This is not surprising, as the elements of negligent misrepresentation are identical to those of fraudulent misrepresentation (or concealment), except that a plaintiff need only show that the defendant *negligently* failed to ascertain the truth or falsity of the representation or negligently concealed or failed to disclose the material facts, rather than that they knew it was false. *Hasenfus v. Secord*, 962 F.2d 1556, 1561 (11th Cir. 1992).

This Court will affirm the Bankruptcy Court's second basis for finding that Leiter owed the Investors a duty to disclose the Beacon Homes Profit. The Bankruptcy Court made no clear error in finding that Leiter had a duty to disclose the Beacon Homes Payment because the Investors did not have an equal opportunity to become apprised of the true cost of acquiring the property and the Beacon Homes Payment.

**Duty to Disclose the Beacon Homes Payment**

Leiter attacks the Bankruptcy Court's finding that he had a duty to disclose the Beacon Homes Payment based on three independent grounds. Doc. 52 at 30–34. "To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.,* 739 F.3d 678, 680 (11th Cir. 2014). Because this Court affirms the conclusion that Leiter had a duty to disclose because he had superior knowledge about the underlying transactions, which the Investors had no way of discovering, there is no need to reach the Bankruptcy Court's alternative third basis for finding that Leiter had a duty to disclose—that because he decided to disclose some information regarding the cost of acquiring the Property, he had to disclose all material facts, including the Payment.[8]

Leiter's primary argument for reversing the Bankruptcy Court's finding that the Investors did not have an equal opportunity to become apprised of the Beacon Homes Payment is that it was "undisputed" at trial that a Florida Department of Revenue form stating the $2.2M purchase price was in the public record, where the Investors could have accessed it. Doc. 52 at 32–34.

---

[8] Specifically targeting the Bankruptcy Court's third basis for finding he had a duty to disclose the Beacon Homes Payment, Leiter also argues that because the investment was offered under Regulation D of the U.S. Securities Act of 1933, it would be an error of law to find that he had a duty to disclose the Beacon Homes Payment. Doc. 52 at 18, 30–32. Because the Court affirms on a different basis (because the Investors had no opportunity to become apprised of the Beacon Homes Payment), it need not reach this argument.

He concedes that the Bankruptcy Court found that the form lacked the normal recording information indicating whether and when it entered the public record. Nevertheless, he argues that there was "no dispute" at trial that the purchase price was accessible in the public record and labels the decision below a clearly erroneous "effort by the Bankruptcy Court to pretend that the price was not disclosed in the public record" and improperly advocate on the Investors' behalf. *Id.* at 34.

The Investors respond that the Bankruptcy Court correctly rejected Leiter's arguments. Doc. 59 at 34–38. They note that Leiter does not challenge the Bankruptcy Court's legal conclusion that a duty to disclose can arise where the parties do not have an equal opportunity to become apprised of the material facts. *Id.* at 34. Thus, they contend that Leiter takes issue with the Bankruptcy Court's factual findings, but fails to establish that the Bankruptcy Court clearly erred by finding that the Investors had no access to the actual purchase price of the property or information regarding the Beacon Homes Payment. *Id.* at 34–35.

The Court agrees with the Investors on this point. First, they accurately note that the sole item of evidence supporting Leiter's argument is a Florida Department of Revenue form used for determining documentary stamp tax (Doc. 46-158), based on which Leiter argues that the true purchase price of the property was available in the Sarasota County Public Records. Doc. 59 at 35. The Investors note that this argument was rejected in the First Findings.[9] *Id.*

---

[9] It was. The Bankruptcy Court stated the following in its First Findings (Doc. 47-268 at 28–29):

They persuasively argue that Leiter has not demonstrated clear error in the Bankruptcy Court's rejection of his public record argument. Doc. 59 at 35. First, they note that Leiter's own testimony regarding the document being recorded in Sarasota County public records was qualified by the phrase "I think," that the exhibit itself contains no county recording information and is more compelling evidence that the purchase price was *not* recorded, and that the testimony of Investor Tompkins (which Leiter cites) does not explain or identify what Tompkins allegedly viewed in the public records, nor did Tompkins reference the recording form in evidence. *Id.* at 36. Thus, the Investors argue that the Bankruptcy Court's decision to weigh the evidence and determine that the recording form was not recorded does not constitute clear error. *Id.* at 36–37.

---

Leiter, however, contends the Plaintiffs were put on inquiry notice because the $2.2 million sales price was disclosed in the public records. In support of that argument, Leiter points to a Florida Department of Revenue form, which is used for determining the documentary stamp tax. That document, which Leiter testified was a public record, reflects a $2,200,000 purchase price.

Ignoring for a moment that the Department of Revenue form flatly contradicts Leiter's contention that the sales price for the DeMarcay property was $3.5 million, the Court is not persuaded that the form was actually recorded in the public record.86 Had the form been recorded in the public record, it would bear recording information, such as the O.R. Book and Page Number (or the Document ID Number) and the date it was recorded. The Department of Revenue form contains none of that. All it contains is a fax stamp. It is unclear whether the Department of Revenue form was ever recorded in the public record, but what is clear is that there is no evidence before the Court that it was.

On reply, Leiter again asserts that the Investors "never disputed that information regarding the sale of the Property was recorded in the public record," and that the Bankruptcy Court's finding that they did not have an equal opportunity to become apprised of material facts was contrary to the evidence. Doc. 66 at 13–14. He also argues on reply that the investment subscription agreement effectively disclaims liability for any omissions, in line with the Eleventh Circuit's unpublished ruling in *BVS Acquisition Co., LLC v. Brown*, 649 Fed. Appx. 657 (11th Cir. 2016). *Id.* at 14–15. Because the Investors could have requested any information regarding the Property or land acquisition costs from him, or looked up the price in the public records, he argues that the Bankruptcy Court's finding was not supported by competent, substantial evidence. *Id.* at 15.

Leiter's arguments are unconvincing across the board. The Bankruptcy Court did not clearly err in finding that Leiter had superior knowledge about the actual purchase price of the property, which the Investors did not have an equal opportunity to become apprised of.

The Exhibit Leiter relies upon indeed contains a space at the bottom for County recording information. Doc. 46-158. But that space is blank, so it is not clear the document was recorded in the Public Records, or when it might have been. Both facts need to be established to determine that the Investors had an opportunity to look the purchase price up in the Public Records, and both are relevant to the issue of whether and when the Investors had an opportunity to discover the price.

The Investors (and the Bankruptcy Court below) accurately summarized the testimony at trial: Leiter testified that he thought the document was recorded, but neither he nor the other Defendants ever submitted a copy of the document bearing recording information. And Tompkins, a plaintiff-investor, only vaguely indicated that he had seen the purchase price somewhere in the public records at some point. The Bankruptcy Court weighed the testimony of Leiter and Tompkins. Ultimately, it found that the greater weight of the credible evidence proved that the purchase price was not disclosed in the Public Records or known to the Investors when they invested in Palm Avenue. Leiter provides no persuasive argument that this was clear error.

Additionally, in his reply brief, Leiter argues that the Investors could have asked questions, requested information, or conducted investigation regarding the Property or its acquisition costs. Doc. 66 at 14–15. Therefore, he argues that "undisputed record evidence" shows that the Investors in fact had an equal opportunity to be apprised of the Payment. *Id.* at 15.

These assertions are far from "undisputed." In fact, the Bankruptcy Court (and the Investors in their briefing before this Court) provided detailed citations to testimony in support of its finding that the Investors did not have an equal opportunity to learn about the payment because Leiter and his family members repeatedly failed to provide financial information to the Investors. Doc. 47-268 at 9–10, 16 ("Between late 2006 and the end of 2008, the Plaintiffs were not receiving any financial information on the project. Some Plaintiffs asked for financial information during that time period but never received it.")

The Court thus affirms the Bankruptcy Court's finding that Leiter had a duty to disclose the Beacon Homes Payment based on his superior knowledge of the actual purchase price of the property. *Telesphere Int'l, Inc. v. Scollin*, 489 So. 2d 1152 (Fla. 3d DCA 1986) (citing 27 Fla. Jur. 2d *Fraud and Deceit* § 38 ("The nondisclosure of a material fact by one party to a transaction may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact.")).[10]

### D. <u>Material Misrepresentation or Omission</u>

Next, Leiter argues that the Bankruptcy Court erred in finding that his failure to specifically disclose the Beacon Homes payment was a *material* misrepresentation or omission. Doc. 52 at 34–42. He contends that the record evidence shows that he did not conceal the Payment and that it was not material to the Investors' decision to invest

---

[10] Leiter cites *BVS Acquisition Co., LLC v. Brown*, 649 Fed. Appx. 651 to argue that the Investors' reliance on the PPM was unreasonable and negated by the Subscription Agreement. However, *BVS* is distinguishable and not binding on this Court. The *BVS* Court ruled in favor of the defendant, a former bank chairman and CEO, finding that the plaintiffs' claims for negligent misrepresentation and breach of fiduciary duty were contradicted by the express terms of their written investment subscription agreement.

There, the Court ruled in favor of the defendants namely because the plaintiffs claimed that the bank's president made express, oral misrepresentations regarding the bank stock to induce them to make the investment. *Id.* at 662. Significantly, however, the subscription agreement expressly stated that no oral or other representations had been made regarding the investment. 649 Fed. Appx. at 660.

*BVS* is not on point because here, the Investors make no claims regarding oral misrepresentations or subsequent modifications to the subscription agreement. Additionally, the subscription agreement in no way disclaimed breaches of fiduciary duty or self-dealing, Leiter's core conduct at issue. Here, the investors sued based on Leiter's $1,000,000 payment to himself, which was not disclosed in the PPM or elsewhere. Leiter cites no case in which such alleged self-dealing or fraudulent concealment such as this was found to have been waived in an investment agreement.

in Palm Avenue anyway. *Id.* And Leiter asserts that this error tainted the Bankruptcy Court's rulings in favor of the Investors on their claims for fraudulent and negligent misrepresentation (Counts 2 and 3), as both claims required them to establish concealment or nondisclosure of a material fact. He also argues that the Court should consequently reverse the finding in favor of the Investors on the breach of fiduciary duty claim, which was also premised on his alleged nondisclosure of the Beacon Homes profit. *Id.* at 34.  In short, Leiter argues that the PPM accurately disclosed the "Land Acquisition and Related Costs," that he did not conceal anything, and that the Bankruptcy Court erred in finding that the Beacon Homes Payment was material.

### i. Concealment of the Beacon Homes Payment

The Court begins with Leiter's argument that the Beacon Homes payment was not concealed, and that the PPM was accurate. This argument is unpersuasive, and the Bankruptcy Court did not clearly err in finding otherwise.

According to Leiter, the PPM accurately reflected the $3.725M purchase price Palm Avenue paid for the property's acquisition and "related costs." Doc. 52 at 34–36. He argues that the total amount to acquire the property included the Beacon Homes Payment, and that the Bankruptcy Court thus erred in finding that Leiter failed to disclose the payment. *Id.* at 35. Additionally, Leiter argues that the purchase price was "disclosed in the public record" and therefore not concealed. *Id.* at 35–36.

The Investors respond that the PPM's land acquisition cost number was not correct, because the $3,725,000 figure for acquisition costs was provided without the context that it included $1,000,000 Leiter paid to himself. Doc. 59 at 45. Further, the

Investors argue that the PPM misled them into believing that Leiter was in the same position as they were and would only see a profit on the project if it was successful. *Id.* at 47. Instead, they argue that he underhandedly guaranteed himself a $1,000,000 profit from the outset. *Id.* Moreover, the Investors argue that Leiter's public record argument is meritless and should be rejected based on their previous rebuttals.

Leiter replies that the Bankruptcy Court's finding that the accurate acquisition cost was actually $2.5 million (the price Leiter initially contracted to purchase it for before Beacon Homes sold it to Palm Avenue) was unsupported by substantial evidence. Doc. 66 at 17. Finally, he argues that the Bankruptcy Court's finding regarding accurate purchase price was contrary to the contracts between Palm and the Investors, and that the trial court's "belief" that the cost should have been lower does not render the PPM a material misrepresentation. *Id.* at 18. Therefore, Leiter asks for reversal of the Amended Final Judgment.

First, Leiter's conclusory public record argument was already rejected and merits no further discussion. Next, to the extent Leiter challenges the factual findings of the Bankruptcy Court, he fails to establish clear error in its finding that the PPM was inaccurate as to the land acquisition cost. In its First Findings, the Bankruptcy Court responded to Leiter's argument that the PPM's description of the land acquisition costs was accurate (Doc. 47-268 at 16.):

> To begin with, the Court is not persuaded by Kopecky's testimony [that the private placement memorandum stated accurately that the actual cost of acquiring the land was $3.725 million]. Kopecky's testimony is premised on the erroneous assumption that the private placement memorandum accurately stated that the land acquisition cost was

$3,725,000. In actuality, the land acquisition cost was $2.5 million (the $2.2 million sales price plus the $300,000 assignment fee to acquire the contract from Howard Rooks). The remaining $1 million was simply a payment to a strawman to allow Leiter to skim $1 million off the top of the project. Putting aside the fact that Kopecky's testimony is based on a false assumption, it simply defies common sense that the Plaintiffs would not have cared that Leiter was planning on skimming $1 million off the top of the $2.5 million he raised for the project, particularly where the $2.5 million was well short of the $4 million Leiter hoped to raise.

Leiter provides no persuasive evidence or legal authority showing that the Bankruptcy Court clearly erred in finding that the accurate purchase price was not reflected in the PPM, not in the public record, and inaccurate despite the expert testimony on Leiter's behalf. Instead, the Bankruptcy Court found based on evidence and testimony that Leiter misrepresented the cost of the property as $1,000,000 higher than it truly was in order to guarantee himself a profit (and conceal that profit). Leiter offers no sound argument for disturbing this finding, and the Court is not "left with the definite and firm conviction that a mistake has been committed." *Morrisette-Brown*, 506 F.3d at 1319. Thus, the rulings below will not be reversed based on either of Leiter's arguments.

### ii. Materiality

Next, Leiter argues that the Court erred in finding that the Beacon Homes Payment was material by relying on the Investors' self-serving testimony and disregarding unrebutted expert evidence to the effect that the Payment did *not* impact the property's value. Doc. 52 at 36–42.

First, Leiter asserts that the Investors' testimony—that they would not have invested had they known about the Beacon Homes payment—was insufficient to

establish materiality as a matter of law. *Id.* at 36–37. Further, he argues that it is impossible for the Investors to establish that including additional information in the PPM would have impacted their decision given the fact that they did not read it. *Id.* at 36–37. In addition, Leiter argues that for a concealed fact to be material, it must have affected the value of the property or caused loss to the purchaser. *Id.* at 36 (citing *Pryor v. Oak Ridge Development Corp.,* 119 So. 326, 327 (Fla. 1928)).

The Investors disagree that the Court relied on "self-serving testimony" to find materiality and contend that Leiter fails to put forward any evidence or legal authority establishing clear error besides a distinguishable district court decision. Doc. 59 at 48–50. They argue that the Beacon Homes Payment, which Leiter used to pay himself a large profit, did not have to affect the value of the Property to be material, and that the Bankruptcy Court analyzed this issue correctly. Doc. 59 at 50–53.

A concealed fact is material where, but for its nondisclosure, the plaintiff would not have entered into the transaction. *Humana, Inc. v. Castillo,* 728 So.2d 261, 265 (Fla. 2d DCA 1999). The rulings below will be affirmed on this point. First, Leiter's argument that the Bankruptcy Court was required to adopt his expert's opinion as to the value of the property simply because the Investors did not present expert testimony is wrong.[11] Nor has he provided any persuasive legal argument or evidence that the

---

[11] *Gregg v. U.S. Indus., Inc.,* 887 F.2d 1462, 1469 (11th Cir. 1989) ("Even uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it.); *Bates v. State,* 506 So.2d 1033, 1034 (Fla. 1987) ("[E]xpert testimony ordinarily is not conclusive even when uncontradicted"); *Easkold v. Rhodes*, 614 So. 2d 495, 497–498 (Fla. 1993).

Court below relied only on "self-serving testimony" in establishing materiality. Instead, the Bankruptcy Court found that the best metric for the price of the property would be, quite logically, the price it had just been sold for. At least on this issue, common sense can prevail over expert witness testimony, even when unrebutted.[12]

The First and Second Findings thoroughly laid out the testimony and evidence, inferences based on the evidence, credibility determinations, and arguments of counsel it relied upon to reach the conclusion that the Beacon Homes Payment was material. *See* Docs. 47-268, 47-311. The Bankruptcy Court found that the Investors testified "credibly" that knowing about the Beacon Homes Payment would have led them not to invest in Palm Avenue, and Leiter fails to cite any evidence to show that this finding was clearly erroneous.

Next, *Pryor v. Oak Ridge Development Corp.,* 119 So. 326, 327 (Fla. 1928) is not as helpful to Leiter as he argues. Leiter's view is that, based on *Pryor*, a fact cannot be material unless it affects the value of the property in question. And here, he asserts the value of the property was unaffected by his failure to specifically disclose the Beacon Homes Payment. Doc. 52 at 38–42.

*Pryor*, however, imposes no such strict limits on the definition of materiality. Instead, in order for an allegedly concealed fact to be material, it must be one such that "a contract would not have been entered into but for the concealment." *Casey v. Cohan*, 740 So. 2d 59, 62 (Fla. 4th DCA 1999) (citing *Morris v. Ingraffia*, 154 Fla. 432, 18 So.

---

[12] And besides, as the Second Findings pointed out, Leiter's own valuation expert conceded that the most accurate indicator of value is often the actual sales price. Doc. 47-311 at 31.

2d 1, 3 (1944)). Additionally (and in line with *Pryor*), the concealment of a material fact "must affect the value of the property or cause loss to the purchaser" to where the defrauded party, "peculiarly prejudiced by its falsity, is placed in a worse position than he otherwise would have been." *Id.* (quoting *Pryor,* 119 So. at 329). Indeed, "it is sufficient if the party misled has been very slightly prejudiced, if the amount is at all appreciable." *Id.*

Here, the Investors alleged that Leiter concealed the true acquisition cost of the property, as well as the behind-the-scenes maneuvering through which he pocketed $1,000,000 of profit at the outset of the transaction. On review, this is clearly enough to satisfy the standard for materiality—as the Investors argue that they were misled as to some of the key elements of the transaction and "placed in a worse position" than they otherwise would have been, which led to their investments in Palm Avenue and the ultimate loss of those entire investments.

*Kalil v. Blue Heron Breach Resort Developer, LLC,* 720 F. Supp. 2d 1335, 1343 (M.D. Fla. 2010), which Leiter also cites, is non-binding and distinguishable. Leiter relies on it to argue that mere statements by a plaintiff that they would not have invested had they known a certain fact is not sufficient to render that fact material. While that in itself may be true, *Kalil* found that certain facts regarding a property transaction were not material because the plaintiffs there were not "deceived as to the location, condition, or title to the condominium that they purchased." 720 F. Supp. 2d at 1344. Here, in contrast, the Investors never actually owned the property in question. Instead, their investments entitled them to interests in the Palm Avenue

project, which never broke ground and instead went bankrupt. The Investors persuasively argue that Leiter's fraudulent omission was material even though it may not have affected the value of the property, because they would never have invested in the development project had they known of Leiter's hidden profit. Doc. 59 at 49–50.

And in fact, *Kalil* highlights the reasons that the instant case is distinguishable. The *Kalil* Court found that its facts were "analogous to *Pryor*" because the plaintiffs (who purchased a yet-to-be-built condo and later sued based on the seller failing to disclose that a previous buyer had contracted for the unit, at a lower price, but never closed) "were not deceived as to the location, condition or title to the condominium that they purchased"; additionally "Plaintiffs believed that the price they were paying was fair and reasonable and it [was] not shown to have been otherwise." 720 F. Supp. 2d at 1344.[13]

Here, again, the Investors never owned the Property, and their investment in the Palm Avenue enterprise is not akin to buying a specific house or a condo. Rather, they were told that their investments were for interests in a sizable and promising development project in its infancy, for which the land acquisition cost was $3.725M. Leiter failed to accurately disclose this acquisition cost because he hid a $1,000,000 payment to his own company, which the Investors argued (and the Bankruptcy Court agreed) was a material omission. The Bankruptcy Court found this to be a material

---

[13] *Pryor* and *Kalil* are also distinguishable because, as both the Bankruptcy Court and the Investors note, they dealt with cases where a plaintiff was seeking rescission of a real property contract or purchase. *See* Doc. 59 at 51.

fact, and Leiter's argument that this was clear error is unpersuasive. The Bankruptcy Court's conclusion that Leiter had a duty to disclose is affirmed.[14]

### E. **Statute of Limitations**

The next issue is whether the Bankruptcy Court erred in finding that the claims for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation were not time-barred. Leiter argues that it did, because Counts 1, 2, and 3 were premised on alleged fraud that occurred before the investments were made in 2005—and the Investors only filed suit six years after their claims accrued, outside the four-year statute of limitations. Leiter argues that the Bankruptcy Court's application of the delayed discovery and fraudulent concealment tolling doctrines was wrong.

As to delayed discovery, Leiter argues that the Investors could have discovered the Beacon Homes Payment had they exercised their rights to inspect the company's books and records. He also again argues they were on constructive notice based on the

---

[14] Leiter also argued (Doc. 52 at 37–38) that "it is impossible for [the Investors] to establish that including additional information in the PPM would have impacted their decision to invest" because they did not read it," citing *Pinnacle Commc'ns. Int'l, Inc. v. Am. Family Mortgage Corp.,* 417 F.Supp.2d 1073, 1087 (D. Minn. 2006) (applying Florida law).

The Investors respond that any individual plaintiff's failure to read the PPM before investing would not affect Leiter's duty to disclose the Beacon Homes Payment based on his superior knowledge of the transaction, because the Bankruptcy Court did not rule that he was required to make the disclosure in the PPM, but only that he had to disclose the Payment to the Investors. Doc. 59 at 50.

Leiter offers no persuasive counterargument in his reply (Doc. 66) and the Court agrees with the Investors. The "superior knowledge" reason for finding Leiter's duty to disclose still stands up, even if the Court were to apply the District of Minnesota case cited by Leiter.

purchase price purportedly being in the public records. As to the fraudulent concealment doctrine, he similarly argues that the Beacon Homes Payment and any other relevant transactions were in the books and records, and the Investors merely failed to exercise their rights to inspect them, which does not equate to fraudulent concealment.

The Investors argue that Leiter gets the law wrong as to delayed discovery, because the last element constituting a cause of action for breach of fiduciary duty is damages. They argue that they did not suffer damages until Palm Avenue went out of business, and lost the property, which meant the loss of any respective investments. Because this was after 2012, the Investors argue their claims cannot be barred by any statute of limitations. They also argue that the Bankruptcy Court properly applied the fraudulent concealment doctrine, and that Leiter does not show that any of its factual findings or legal conclusions were erroneous as to this issue.

As to their breach of fiduciary duty claim, the Investors argue that their causes of action did not accrue until they suffered damages when Palm Avenue went out of business and lost the property. Doc. 59 at 56. They argue that even if this argument was not credited, the Bankruptcy Court properly ruled based on the fraudulent concealment doctrine that they could not have reasonably discovered Leiter's fraudulent misrepresentation until April 2009 when he provided documentation regarding the purchase price and funds raised for the Property.

Upon *de novo* review of the issue, this Court finds that the Investors' claims were not time barred, and Leiter's arguments that the Investors could have been aware

of the Beacon Homes Payment earlier fail. Rather than opine for the first time on the Investors' arguments that their damages did not accrue until Palm Avenue entered bankruptcy in 2012, this Court affirms the rulings below based on the fraudulent concealment and delayed discovery doctrines.

Leiter argues that the Bankruptcy Court should have found that the Investors' Claims were barred by the statute of limitations. Doc. 52 at 42–48. He contends that Counts 1 through 3 were covered by a four-year statute of limitations under Florida law, that the Investors filed their initial complaint more than six years after the alleged actions that gave rise to the claims, and that the Bankruptcy Court wrongly applied the doctrines of delayed discovery and fraudulent concealment to toll the statute of limitations. *Id.* The Investors respond that the Bankruptcy Court correctly held that the statute of limitations had not run, and that Leiter fails to show clear error. Doc. 59 at 63–68.

The question of whether a claim was barred by the statute of limitations is a question of law reviewed de novo. *NE 32nd Street, LLC v. United States,* 896 F.3d 1240, 1243 (11th Cir. 2018); *Kaleta v. Sokolow,* 183 B.R. 639, 641 (M.D. Ala. 1995).

In its First Findings, the Bankruptcy Court found that the Investors' fraudulent concealment claim was not barred by the statute of limitations. Doc. 47-268 at 35–38. First, it found that to show that the fraud claim was time-barred, Leiter needed to establish that the Investors knew or should have known about the facts giving rise to

their claim before October 6, 2007 (they filed their lawsuit on October 6, 2011). The

Bankruptcy Court rejected this argument, finding as follows:[15]

> Leiter was unable to make that showing. The sole basis for Leiter's claim
> that the Plaintiffs should have known of the $1 million Beacon Homes
> payment by October 2007 is the fact that the Department of Revenue
> form reflecting the $2.2 million sales price was purportedly in the public
> record in July 2005 and that some of the Plaintiffs testified that they were
> becoming concerned about a pattern of misinformation as early as 2006.
> None of that evidence suggests the Plaintiffs should have known of
> Leiter's fraud. As the Court has already explained, the record evidence
> does not support the conclusion that the Department of Revenue form
> was actually recorded in the public records. Had it been, the form would
> contain basic recording information. But it does not. And while it is true
> that Mark Cramer testified that by 2006 and 2007, he "could see a pattern
> developing of misinformation and misappropriation by the Leiters," and
> that Joseph O'Neill testified that he "didn't feel [he] was getting the
> simple, clear, concise truth" from Leiter, the Court is not convinced they
> should have known of Leiter's fraud at that point.

The Bankruptcy Court next rejected Leiter's argument that the Investors could

and should have discovered his fraud through due diligence, and by exercising their

right to inspect Palm Avenue's books and records, as they had the right to. *Id.* at 37.

In fact, it found that the Investors had tried to do so on numerous occasions and been

thwarted by Leiter and his son. *Id.* The Court found that it was not until April 2009

that Leiter produced information reflecting the Beacon Homes Payment. *Id.* at 38.

Thus, the Bankruptcy Court stated that it was:

> convinced that is the earliest the Plaintiffs could have known of Leiter's
> fraud. The Court need not go any further than that because this action is
> not time barred so long as the Plaintiffs did not discover (or should not
> have discovered) Leiter's fraud before October 2007. Because the

---

[15] The Bankruptcy Court's footnotes are removed from this excerpt of the First Findings. *See*
Doc. 47-268 at 36–41.

> Plaintiffs could not have discovered their fraudulent concealment claim
> until April 2009, their fraudulent concealment claim is not time barred.

*Id.* at 38.

In its Second Findings, where the Bankruptcy Court addressed the remaining counts, it again found that the Investors' claims were not time barred. Doc. 47-311 at 10–15. The Bankruptcy Court first reiterated that the statute of limitations on the fraudulent misrepresentation claims, by statute, does not begin to run until the facts underlying the cause of action were or should have been discovered with the exercise of due diligence. *Id.* at 11. As it found for Count Two, the Bankruptcy Court found that the other fraudulent misrepresentation counts were not time barred because the Investors could not have and did not become aware of the facts giving rise to those claims until April 2009. *Id.*

As for the negligent misrepresentation, breach of fiduciary duty, and other claims, the Bankruptcy Court found they too were not time barred—this time based on the fraudulent concealment doctrine, which tolls a statute of limitations when a defendant keeps its "improper conduct shrouded from sight." *Id.* at 12. For three separate reasons, it found that Leiter fraudulently concealed his improper conduct. Specifically, these were: (1) because Leiter "actively thwarted the Investors' efforts to gain effort about the project between 2006 and 2008;" (2) because "when Leiter finally began providing financial information to the Investors in April 2009, he did not specifically disclose the $1 million payment to Beacon Homes;" and (3) because Leiter

never answered "the simplest question posed by one of the Investors: How much did Palm Avenue Partners pay for the DeMarcay property?" *Id.* at 12–15.

Leiter fails to show that any of these factual findings were clearly erroneous, and the Court similarly concludes, upon *de novo* review, that the Investors' claims were not time-barred.

### i. Delayed Discovery

The Bankruptcy Court properly found that the delayed discovery doctrine tolled the statute of limitations as to Count 2. This doctrine applies to claims for "fraud, products liability, professional and medical malpractice, and intentional torts based on abuse." *Davis v. Monahan,* 832 So. 2d 708, 710 (Fla. 2002). The delayed discovery doctrine provides that a cause of action does not accrue until the plaintiff knows or reasonably should know of the tortious act giving rise to the cause of action. *Patten v. Winderman*, 965 So.2d 1222, 1224 (Fla. 4th DCA 2007).

Leiter argues that the Investors could have discovered the facts giving rise to their causes of action within two years after investing in Palm Avenue. Doc. 52 at 44. He asserts that the Investors were entitled to inspect Palm Avenue's books and records under the Operating Agreement but failed to do so, and that the Leiters had provided tax returns upon certain requests for them. *Id.* at 45. Leiter also again argues (without addressing the problems the Bankruptcy Court and the Investors pointed out with this argument) that the purchase price was disclosed in the public record.

Leiter's argument that the Beacon Homes Payment was in the public record fails. He fails to show that the Bankruptcy Court's well-reasoned factual findings on

this issue were erroneous. Again, the Bankruptcy Court found that the evidence of the purchase price being in the public records was no evidence at all because the form in question lacked recording information showing when the document became public record. Leiter's brief simply states that the purchase price was disclosed in public records as of July 2005, but conveniently ignores the fact that no date of recording is included on that form, so this date appears to be pulled out of thin air. *See* Doc. 46-158. This Court thus has no basis for finding that the Bankruptcy Court erred in rejecting the form as evidence of any filing in the public records.

Nor has Leiter established clear error in the Bankruptcy Court's factual finding that the Investors tried to exercise due diligence and examine Palm Avenue's books and records, but that Leiter and Palm Avenue failed to let them do so or share detailed financial information until April 2009. The Bankruptcy Court cited the testimony of numerous investors who sought financial documents and other information from Leiter, but never received anything that would have indicated the Beacon Home Payment until April 2009. Doc. 47-311 at 12–13. Leiter's arguments to the contrary fail to show that these factual findings were erroneous, and the Court thus will affirm the Bankruptcy Court's conclusion that the delayed discovery doctrine applied here, because the Investors' causes of action did not accrue until they knew or reasonably should have known of Leiter's tortious acts: no earlier than 2009. *Winderman*, 965 So.2d at 1224.

### ii. Fraudulent Concealment

The fraudulent concealment doctrine may toll the statute of limitations if a defendant undertakes "subsequent actions to keep the improper conduct shrouded from sight." *W. Brook Isles Partner's 1, LLC v. Com. Land Title Ins. Co.,* 163 So.3d 635, 639 (Fla. 2d DCA 2015). For this doctrine to apply, a plaintiff must establish: (1) the defendant's successful concealment of the cause of action and (2) fraudulent means to achieve that concealment. *Id.*

Leiter argues that the Investors did not establish that he used fraudulent means to willfully conceal the facts giving rise to their claims and that their failure to exercise their rights does not establish fraudulent concealment. *Id.* at 46–48. Furthermore, he argues that the Bankruptcy Court erroneously applied the fraudulent concealment doctrine to the Investors collectively, instead of evaluating whether any individual plaintiff could prove their individual claim. *Id.* at 47. Leiter also argues that the court below identified only three Investors who claimed that they asked for financial information that was not provided, that one of those Investors did not prevail on his claim, and that the other two did not direct their questions to Leiter himself. *Id.* at 47–48.

The Investors respond that application of the fraudulent concealment doctrine below was correct. Doc. 59 at 56–59. They argue that all of the Investors testified to requesting information about Palm Avenue and receiving nothing until 2009 at the earliest. They also argue that Investor Grant did testify to never requesting financial information from Leiter, but that there is no evidence in the record to demonstrate that

he should have requested such information as he relied on his trust in Leiter and the misrepresentations in the PPM, and that the Appellants have failed to show that the bankruptcy court committed clear error in rejecting Appellants' statute of limitations defenses. *Id.* at 57 (citing testimony). In conclusion, the Investors argue that the Bankruptcy Court clearly reached the correct conclusion based on the Investors' damages not incurring until well after 2009. *Id.* at 59.

As accurately described by the Bankruptcy Court, the fraudulent concealment doctrine tolls the statute of limitations where a defendant keeps its "improper conduct shrouded from sight" and uses fraudulent means to do so. *W. Brook Isles Partner's 1, LLC v. Com. Land Title Ins. Co.*, 163 So. 3d 635, 639 (Fla. 2d DCA 2015). The Second Findings laid out three ways in which Leiter did so: actively stopping the Investors from gaining information about the project between 2006 and 2008; failing to *specifically* disclose the Beacon Homes Payment when he did finally let some information out in 2009; and never answering one Investor who directly asked how much the property had been purchased for. Doc. 47-311 at 12–15.

Leiter argues that the Bankruptcy Court wrongly imputed actions of his wife, Barb Leiter, and son, Matt Leiter, to him in finding that he thwarted the Investors' efforts to gain information, and that the Bankruptcy Court "identified only three Plaintiffs who claimed that they asked for financial information that they did not receive."

Leiter's first argument falls flat. The Bankruptcy Court indeed references actions of Barb and Matt Leiter, in addition to Tom Leiter, in discussing the ways in which

the Investors were hindered from acquiring information about Palm Avenue. However, it also emphasizes Leiter's failure to provide financial information to Olson, And excuses Leiter gave Olson regarding inspecting the books and records are clearly highlighted. Further, Leiter cites no legal authority that would prohibit the Bankruptcy Court from considering the actions of family members involved in the business in the context of fraudulent concealment. Thus, the Bankruptcy Court's factual findings were not clearly erroneous, and it properly applied the law in finding that Leiter's active failure to respond to the Investors' inquiries, failure to specifically disclose the Beacon Homes Payment in 2009, and his failure to provide an answer as to the true cost of acquiring the property constituted improper conduct shrouded from sight using fraudulent means.

Although Leiter takes umbrage at the fact that he was held "responsible for statements or conduct by other individuals" and that the Bankruptcy Court "allow[ed] Plaintiffs to prove their claims collectively, instead of evaluating whether any individual Plaintiff could prove his or her individual claim," these objections are not supported by any citation to legal authority. Leiter's arguments for reversal of the Amended Final Judgment fail and the Court affirms the ruling below that the Investors' claims were not time-barred based on the delayed discovery and fraudulent concealment doctrines.

**F. Speculative Damages**

Next, Leiter argues briefly that the Bankruptcy Court erred by awarding the Investors the full return of their investment. Doc. 52 at 48–49. He claims this award

was speculative and unproven because the Investors failed to "present any evidence resulting from the Beacon Homes Payment" and have not shown that their membership units have "no value." *Id.* Additionally, Leiter argues that the Investors and other Palm Avenue members may yet see a recovery after the bankruptcy plays out if the Property were to be developed, and that any award to the Investors in the amount of their investment is thus speculative. *Id.* at 49.

The Investors respond that return of their entire investments was proper. Doc. 59 at 59–61. As for the issue of a post-bankruptcy distribution, they assert that no evidence of this distribution plan was introduced at trial, nor was a motion filed asking the Bankruptcy Court to take judicial notice of such a plan. *Id.* at 69. Thus, they argue that this evidence cannot be considered on appeal. And even if it could be, they argue that such evidence would have done nothing to prevent the Bankruptcy Court from awarding the Investors a return of their entire investments on the claims for fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty against Leiter. *Id.* at 69.

Leiter replies that the Bankruptcy Court committed clear error when it awarded the Investors their full investments because it did not "rescind the purchases and allowed them to maintain their membership units." Doc. 66 at 32–33. He again argues, citing no legal authority, that a return of the investments would "only be appropriate if Plaintiffs presented evidence that the units they purchased had no value at all," which he says they "did not and could not." *Id.* at 33.

This Court will affirm the Bankruptcy Court's ruling below on damages. Leiter cites no authority showing that the Investors were required to affirmatively establish that their membership units in the failed real estate project were worthless in order to receive the return of their investments as damages, or that the Bankruptcy Court erred in some other way.

Leiter is right that under Florida law, a plaintiff may only recover damages calculable with a reasonable degree of certainty. *Travelers Indem. Co. of Conn. v. Richard McKenzie & Sons, Inc.,* 326 F. Supp. 3d 1332, 1344 (M. D. Fla. 2018) (*citing Sostchin v. Doll Enter., Inc.,* 847 So. 2d 1123 (Fla. 3d DCA 2003). But the cases he cites are both distinguishable. *Travelers* found that a $2.965 million consent judgment damages award was unreasonably certain because "not a single citrus expert felt comfortable projecting damages beyond" a certain growing season given the "disease, natural disaster, and other events that [often] reduce the yield." 326 F. Supp. 3d at 1343–44. And *Sostchin* also found prospective lost profits damages to be unreasonable due to the faulty methodology utilized in making such a forecast. 847 So. 2d at 1125–27.

This case, however, has no connection to the challenges of forecasting future agricultural conditions or future profits, and Leiter fails to show the Bankruptcy Court erred in arriving at its damages award or applied an incorrect legal standard. The Bankruptcy Court's decision to award the full amount of the investments (to those investors who prevailed) on the claims for fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty is affirmed.

**The Investors' Cross-Appeal**

On cross-appeal, the Investors argue that the Bankruptcy Court erred by: (1) failing to award any damages to Plaintiff Southby Partnership, Ltd; (2) failing to award full damages to appellee Cramer; and (3) failing to award the Investors their attorneys' fees and reasonable costs based on a proposal for settlement they made to Leiter.

**A. <u>Damages – Cramer</u>**

First, the Investors argue that Cramer should have been awarded $200,000— which they claim was his total investment in Palm Avenue—rather than the $100,000, plus interest, that the Amended Final Judgment awarded him (Doc. 47-8). The additional $100,000 was invested by Cramer through his pass-through company Cramer Holdings, LLC. Doc. 59 at 13. Cramer argues that although the check he wrote to make this second investment was not introduced at trial, it is undisputed that he invested a second $100,000 and "appears undisputed" that this investment came in the form of a check drawn from an account of Cramer Holdings. *Id*. What *was* introduced at trial, Cramer contends, was a preferred "Certificate of Membership," signed by Leiter, stating that he owned 2 membership interest units in Palm Avenue. *Id.*

After trial, in their proposed findings of fact, Defendants argued that Cramer Holdings, LLC, was the proper party to bring an action for the second $100,000, not Cramer individually. Cramer argues that the Bankruptcy Court implicitly accepted this argument, without addressing it in either the First or Second Findings and awarded

Cramer damages in the amount of $100,000 in the Final Judgment and Amended Final Judgment. *Id.* at 14.

The Bankruptcy Court denied Cramer's motion to alter the initial judgment and increase his damages award by $100,000. *See* Doc. 46-7. Specifically, it noted that Cramer admitted that he bought one membership unit in his own name, and then bought a second for "an additional $100,000 through his company, Cramer Holdings, LLC." *Id.* at 6. The Court found the Investors failed to provide any legal authority for their request to award Cramer, individually, the return of an investment by a separate entity, and therefore declined to award him anything beyond the $100,000 he invested individually. *Id.* at 6–7.

Cramer argues that regardless of the source of the funds, the owner of an investment interest is the person whose name the property or interest is titled. Doc. 59 at 15. At trial, he argues the only evidence presented shows that Cramer, individually, owned the two membership units in question. *Id.*

Even if the Court below was legally correct, Cramer argues that the Court should reverse the Amended Final Judgment based on the doctrine of equitable assignment and instruct the Bankruptcy Court to enter a final judgment awarding $200,000 plus interest to Cramer. Doc. 59 at 15–16. If an equitable assignment were found, Cramer argues that he would be the proper party in interest to maintain the actions against Leiter and recover the full $200,000 amount of his investment.

Leiter responds that the Bankruptcy Court did not clearly err when it found that Cramer could not recover the money invested by Cramer Holdings. Doc. 66 at 36–39.

As for the evidence, Leiter argues that Cramer testified to individually investing $100,000, which was followed by Cramer Holdings' $100,000 investment, and that the relevant subscription agreement was signed by Cramer on behalf of Cramer Holdings. *Id.* at 36. He also argues that Cramer presented little evidence regarding the relationship between him and his company, and no evidence or testimony that the company transferred or assigned its investment to Cramer. *Id.* at 37.

As for the law on this issue, Leiter argues that limited liability companies are separate legal entities that can hold property, that individual LLC members are not entitled to recover directly for damages suffered by an LLC, and that Cramer failed to demonstrate that the Bankruptcy Court clearly erred in limiting his damages to $100,000. *Id.* at 38–39.

Cramer replies that Leiter's entire argument is based on a document not admitted at trial. Doc. 69 at 1. He reiterates the arguments in his initial brief and argues that the documentary evidence before the Bankruptcy Court established that Cramer's name was on the legal title to the two membership interest units at issue and that Palm Avenue, Cramer, and the Leiters all "knew and understood" that Cramer had purchased, "for himself," a second membership interest unit when he made the additional $100,000 investment. *Id.* at 3. He also argues that Exhibit 83, the subscription agreement, was never admitted into evidence at trial, nor did the defendants try to move it in. In sum, Cramer argues that the Bankruptcy Court's factual finding and determination that he should receive $100,000 in damages was not backed by evidence. *Id.* at 5. Additionally, Cramer argues that Leiter failed to respond

to his equitable assignment arguments, and that the Bankruptcy Court's ruling should be reversed on that basis as well. *Id.*

Cramer argues repeatedly that the Court cited no authority in determining that he was entitled to only the $100,000 that he invested, rather than $200,000. However, he cites none in turn for the proposition that an individual owner or member of an LLC is necessarily entitled to recover damages on behalf of that entity, even if that company was not a party to the lawsuit. Because Cramer has not shown that he, individually, has standing to recover for the investment of Cramer Holdings, a separate corporate entity, the Court cannot say that the Bankruptcy Court clearly erred in limiting his damages award to $100,000 in the Amended Final Judgment. Therefore, this Court must affirm the Amended Final Judgment as to this issue.

As Leiter argues, limited liability companies are separate entities that can hold property separate and apart from the property of its members, and individual members of an LLC are generally not entitled to recover directly for damages suffered by the LLC. *In re Whittle*, 449 B.R. 427, 430 (Bankr. M.D. Fla. 2011) ("Plaintiffs orally argued that, by virtue of their membership in the LLC, its damages are their own personal damages. This argument fails because it disregards the fact that SGGUSA is a separate legal entity created pursuant to Florida statutes. The Florida statutory scheme is clear that a limited liability company holds property separate and apart from the property of its members . . .").

Next, the equitable assignment argument fails for two reasons. First, the Investors did not make it below in their motion to alter or amend the judgment, where

they sought the additional $100,000. Thus, it does not appear that the argument was properly preserved for appeal. Additionally, this argument fails on its merits because Cramer fails to provide any authority where a Court made an equitable assignment in a similar posture, and also fails to establish that an assignment is necessary to "effectuate the parties' plain intent or to avoid injustice." *SourceTrack, LLC v. Ariba, Inc.,* 958 So. 2d 523, 526 (Fla. 2d DCA 2007).

**B.**   **Damages – Southby**

As related to Plaintiff-Investor "Southby Partnership, Ltd.," the Investors present two interconnected issues on appeal: whether the Bankruptcy Court erred in finding that Southby did not own an interest in Palm Avenue, and whether it erred in awarding nothing in damages to Southby. Doc. 59 at 11. Their argument as to Southby covers largely the same ground as the argument for an increased damage award to Cramer, and it fails for largely the same reasons.

Specifically, the Investors argued (as did Cramer), the Bankruptcy Court should have awarded $100,000 damages to Southby Partnership, Ltd. Unlike Cramer, who purchased a second membership unit with a check in the name of a company he owned, here, Olson invested in Palm Avenue on behalf of his company Olson-Liggett Rexal Drug Store, but Southby claims the interest in Palm Avenue was assigned to it.

Southby argues that, at trial, it was proven that Olson-Liggett Rexal Drug assigned its interest in Palm Avenue to Southby, and that Southby proved that both entities were owned by Doug Olson. Doc. 59 at 17. Southby argues that this assignment was valid and effective, and that even if it wasn't, the Bankruptcy Court

should have found an equitable assignment under Florida law. *Id.* at 29. Citing Florida law, Southby argues that an assignment transfers all rights of the assignor in the thing assigned, that an assignee is the real party in interest and therefore the proper party to file suit as related to that interest, and that an assignment need not be in writing to be valid. *Id.* at 28. Thus, it asks that this Court reverse the Bankruptcy Court's denial of damages to Southby and remand with instructions to enter a final judgment awarding Southby $100,000 in damages plus interest. *Id.* at 28–39.

Leiter responds that the Bankruptcy Court did not abuse its discretion in finding that Southby should not recover damages based on an investment by Olson-Liggett. First, he argues that the PPM prohibited transfers of membership interests except as authorized by the Operating Agreement, and that no evidence was presented at trial to allow the Bankruptcy Court to evaluate whether Southby's assignment was proper. Doc. 66 at 45–46. He argues that in the absence of any details regarding the purported transfer, the Bankruptcy Court did not clearly err in determining that Southby had not met its burden to establish damages. *Id.* at 46. Therefore, he asks that this Court, in accordance with the Bankruptcy Court's order denying Southby's motion to alter or amend the final judgment, reject Southby's argument.[16]

---

[16] On the Investors' motion to alter or amend the judgment (Doc. 47-7) the Court found again that no authority had been presented allowing it to disregard the corporate form and award Southby Damages on behalf of an investment made by a different entity. It stated that "In effect, the Plaintiffs are asking the Court to disregard the corporate form and award Cramer and Olson the return of investments made by entities they own or control. But they failed to provide any legal authority for that request. The Court will therefore decline to award Cramer any additional damages or Southby any damages at all." *Id.* at 5–6.

For the same reason the Bankruptcy Court denied additional damages to Cramer, it properly denied additional damages for Southby, an entity that did not directly invest in Palm Avenue. Southby provides no persuasive authority to support its argument that the assignment from Olson-Liggett Rexal Drug to Southby was valid and effective under Florida law, nor did it show that an equitable assignment would be proper in this case.[17] Therefore, the Bankruptcy Court's decision not to award any damages to Southby is affirmed.

### C. Investors' Costs and Attorneys' Fees

*Jurisdiction*

Before addressing the substance of the Investors' argument regarding attorney's fees, the Court will address Leiter's jurisdictional argument—that this Court has no jurisdiction to grant relief to any Investor besides Cramer and Southby, because only they filed notices of cross-appeal. Doc. 66 at 41. The Investors argue that this is wrong because all the plaintiffs below were named in the caption of the Amended Notice of Cross-Appeal. Doc. 69 at 13. Further, they argue that the Federal Rules of Appellate Procedure instruct that appeals should not be dismissed for informality of form or title of the notice of appeal, such as failing to name a party whose intent to appeal is otherwise clear from the notice. *Id.* at 13–14 (citing Federal Rule of Appellate Procedure 3(c)(7)).

---

[17] Like Cramer, Southby fails to cite any authority where a Court has made an equitable assignment in a similar posture, and it fails to establish that an assignment is necessary to "effectuate the parties' plain intent or to avoid injustice." *SourceTrack, LLC* 958 So. 2d at 526.

Additionally, the Investors argue that their statement of issues on cross-appeal specifically provides that each Investor appeals the Bankruptcy Court's ruling denying their Joint Motion for Attorney's Fees and Costs, and that Leiter only made this argument well after the notices of appeal were filed. Citing Eleventh Circuit caselaw, the Investors argue that it would not make sense for only Southby and Cramer to appeal the attorney's fees ruling, because the Bankruptcy Court's error and improper application of Florida law affected each Investor equally. *Id.* at 15. Finally, they distinguish Leiter's authority and cite Eleventh Circuit authority in favor of their position.

The Court agrees with the Investors on this point—based on the law of this Circuit, this Court has jurisdiction to grant all of the Investor-Plaintiffs relief on the attorney's fees issue, not just Cramer and Southby. First, Federal Rule of Appellate Procedure 3(c)(7) indeed provides that an appeal must not be dismissed for informality of form or title of the notice of appeal, or "for failure to name a party whose intent to appeal is otherwise clear from the notice." In line with this Rule, all the plaintiff-investors were named in the caption of the Amended Notice of Cross-Appeal. *See* Doc. 47-10.

Additionally, the Investors' authority on this point, specifically *PlayNation Play Sys., Inc. v. Velex Corp.,* 939 F.3d 1205, 1210–11 (11th Cir. 2019), is persuasive. As in that case (where an order awarding attorney's fees was also at issue), it would make "little sense" for only Southby and Cramer, and not the remaining Investors to appeal the denial of their joint motion for attorney's fees. *Id.* at 1211. Southby, Cramer, and

the other Investors share "precisely the same" interest in the appeal, and this Court therefore finds that it has jurisdiction to hear the substance of it. *Id.*

*Attorney's Fees*

The Investors argue that they should have been awarded attorney's fees and costs based on proposals for settlement that each investor, individually, served on Leiter offering to settle all claims for damages against him. Doc. 59 at 20. Thus, they ask this Court to reverse the Order denying their motion for attorney's fees and costs and remand with instructions to determine whether they are entitled to attorney's fees, with the context that *Diamond Aircraft* does not apply. Leiter first argues that because only Cramer and Southby filed notices of cross-appeal, the Court has no jurisdiction to grant relief to any other Investor. Doc. 66 at 41. The Court has already addressed this argument. In addition, Leiter argues that the court below properly applied *Diamond Aircraft*. The Investors reply that each of Leiter's arguments fails. Doc. 69 at 13–16.

After careful review and consideration, the Court finds that the Bankruptcy Court applied a not-entirely-accurate standard to the Investors' motion. The Court will, therefore, remand this case for application of the proper standard.

"This court reviews an award of attorney's fees for abuse of discretion; nevertheless, that standard of review still allows [the Court] to closely scrutinize questions of law decided by the district court in reaching a fee award." *Villano v. City of Boynton Beach,* 254 F.3d 1302, 1304 (11th Cir. 2001) (quoting *Clark v. Hous. Auth. of Alma,* 971 F.2d 723, 728 (11th Cir. 1992)).

A trial court abuses its discretion when it "'fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous.'" *Gray ex rel. Alexander v. Bostic,* 613 F.3d 1035, 1039 (11th Cir. 2010) (quoting *ACLU v. Barnes,* 168 F.3d 423, 427 (11th Cir. 1999)). "An abuse of discretion also occurs when a district court commits a clear error of judgment." *Id.*

Here, after careful review, the Court agrees with the Investors that the Bankruptcy Court used a standard that was, if not outright incorrect, at best incomplete.

Section 768.79 creates a substantive right to attorney's fees when, among other things, a plaintiff refuses to accept an offer of judgment from the defendant, and the resulting judgment is either one of no liability, *MYD Marine Distrib., Inc. v. Int'l Paint Ltd.,* 187 So.3d 1285, 1286 (Fla. 4th DCA 2016), or if the judgment obtained by the plaintiff is at least twenty-five percent less than the amount of the offer. § 768.79. *Starboard Cruise Servs., Inc. v. DePrince,* 259 So. 3d 295, 298 (Fla. 3d DCA 2018)

Florida Statutes Section 768.79 is implemented by Florida Rule of Civil Procedure 1.442, which sets forth various required elements of proposals for settlement. Fla. R. Civ. P. 1.442; *Willis Shaw Exp., Inc. v. Hilyer Sod, Inc.,* 849 So. 2d 276, 278 (Fla. 2003). Rule 1.442 requires a proposal for settlement, among other things, to "state that the proposal resolves all damages that would otherwise be awarded in a final judgment in the action in which the proposal is served," and to "exclude nonmonetary terms, with the exceptions of a voluntary dismissal of all claims

with prejudice and any other nonmonetary terms permitted by statute." Fla. R. Civ. P. 1.442(c)(2)(B), (C).

Below, the Bankruptcy Court found that neither party was entitled to attorney's fees and costs and denied the motion in reliance on *Diamond Aircraft Indus., Inc. v. Horowitch,* 107 So. 3d 362 (Fla. 2013), a 2013 Florida Supreme Court case. Doc. 47-7. Specifically, it found that *Diamond Aircraft* held that "section 768.79 does not apply to an action in which a plaintiff seeks both damages and equitable relief." *Id.* at 10–11. Because the Investors brought two counts for equitable accounting (one direct, one derivative) and the proposals for settlement from each side were directed to all direct claims, including the equitable ones, the Bankruptcy Court found that the proposals for settlement were void and could not serve as the basis for a fee claim. *Id.*

The Investors' argument that the Bankruptcy Court was too quick to shut the door on their argument for fees is well-taken, and they have established that the Bankruptcy Court erred in its legal determination that *Diamond Aircraft* necessarily bars recovery of attorney's fees in this case because the Investors included two counts for equitable accounting in their complaint.[18]

*Diamond Aircraft* indeed states that "section 768.79 does not apply to an action in which a plaintiff seeks both damages and equitable relief." 107 So.3d at 374. But, as

---

[18] Rather than being an open-and-shut issue, the radically different ways Florida courts have ruled on the issue at bar makes clear that, as one Magistrate Judge in the Southern District of Florida stated, "[i]t goes without saying, but nothing involving section 768.79 is persuasive, clear, or determinative. This Florida fee statute has generated far more litigation than was ever imagined or intended." *Saeme v. Levine,* No. 11-21913-CIV, 2012 WL 13134605, at *4 (S.D. Fla. Sept. 13, 2012).

courts wrestling with this issue quickly picked up on, the decision cited two cases brought as declaratory judgment actions in its discussion of cases where only monetary relief was sought. *See, e.g., Lawrence v. ACE Am. Ins. Co.,* No. 8:18-CV-738-SCB-TGW, 2019 WL 8273660, at *5 (M.D. Fla. Oct. 24, 2019).

Thereafter, post-*Diamond Aircraft*, Florida courts have frequently applied a narrow exception to this rule, allowing Section 768.79 to apply to actions including equitable claims when the "true relief" sought through the equitable claim is monetary damages. *Illoominate Media, Inc. v. CAIR Florida, Inc.,* 22-10718, 2022 WL 4589357, at *2 (11th Cir. Sept. 30, 2022) ("Florida state courts interpret Diamond Aircraft by looking beyond the procedural posture of a complaint to assess the 'true relief' a party seeks, and apply section 768.79 if it is damages."); *see also Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.,* 599 F. App'x 875, 883 (11th Cir. 2015).

Fla. Stat. § 768.79 begins with a clause qualifying its application to "any civil action for damages filed in the courts of this state." § 768.79(1). However, in construing the term "civil action for damages," Florida courts have consistently "looked behind the procedural vehicle used to bring the lawsuit and focused on whether the 'real issue' in the case is one for damages." *DiPompeo Constr. Corp. v. Kimmel & Assocs.*, 916 So. 2d 17, 18 (Fla. 4th DCA 2005).

Because the Bankruptcy Court failed to acknowledge this exception and the associated body of caselaw in Florida, this Court will remand with instructions for further consideration of the attorney's fees issue. On remand, the Court below should consider the request for fees in light of the "real issue," or "true relief" doctrine often

used by Florida trial courts and District Courts of Appeal. *See Palm Beach Polo Holdings, Inc. v. Equestrian Club Estates Prop. Owners Ass'n, Inc.,* 22 So. 3d 140, 144 (Fla. 4th DCA 2009); *Starboard Cruise Services,* 259 So.3d at 300 (citing examples of Florida appellate courts applying the "true relief" test to various factual situation); *see also Wickboldt v. Massachusetts Mut. Life Ins. Co.,* No. 6:17-CV-2208-JA-EJK, 2021 WL 4438374, at *7 (M.D. Fla. Sept. 28, 2021).

The doctrine has been applied when an action, other than a straightforward civil damages action, is being used to obtain money damages. Other courts have applied this doctrine where, for example, a plaintiff brought a declaratory action but "the only issue was money" or there was an interpleader action but "the real issue there was entitlement to a real estate commission." *Id.* at 143–44; *see also Tower Hill Signature Ins. Co. v. Javellana,* 238 So. 3d 372, 377 (Fla. 3d DCA 2017); *Polk Cnty. v. Highlands-in-the-Woods, L.L.C.,* 227 So. 3d 161, 163 (Fla. 2d DCA 2017).[19]

---

[19] On remand, the Bankruptcy Court should also consider the fact that some Florida courts have suggested that a party may serve a proposal for settlement in a case involving both monetary and equitable claims, but only as long as the proposal is directed only to claims for damages and "carves out" any claims for equitable relief. *See S. Specialties, Inc. v. Farmhouse Tomatoes, Inc.,* 259 So. 3d 869, 872 (Fla. 4th DCA 2018) ("Farmhouse did not attempt to carve out the injunctive relief claim. Its offer attempted to settle all claims. Therefore, *Diamond* is controlling."); *accord Streaming Hub Inc. v. Gayle,* No. 18-24684-CIV, 2019 WL 8275138, at *2 (S.D. Fla. Apr. 12, 2019) (finding offer of judgment invalid because it "did not attempt to carve out the injunctive relief claim); *Highland Holdings, Inc. v. Mid-Continent Cas. Co.,* No. 8:14-CV-1334-SDM-TBM, 2017 WL 3877609, at *1 (M.D. Fla. Sept. 5, 2017) ("[A] party to an action that includes a request for equitable relief cannot recover an attorney's fee under Section 768.79 unless the offer of judgment disavows settling the equitable claim."), *aff'd*, 725 F. App'x 906 (11th Cir. 2018); *see also In re Bhairo,* 630 B.R. 865, 875 (Bankr. M.D. Fla. 2021) (concluding that offers of judgment are allowed in cases involving both monetary and equitable claims, because "(1) an action involving claims for damages and equitable relief is still a 'civil action for damages' under section 768.79; and (2) there is no practical problem to

On remand, the Bankruptcy Court should consider whether this is a case to which the "true relief" standard should apply. If so, it should also determine whether the "true relief" sought by the Investors' action was money damages, and whether the Investors actually pursued any non-monetary relief during the course of the litigation. *MYD*, 187 So. 3d at 1287 ("In the instant case, the trial court applied the 'true relief' analysis outlined above when considering the enforceability of International Paint's offers. Specifically, the trial court found that MYD did not actually pursue any nonmonetary relief during the course of the litigation and instead only sought money damages. In this scenario, it correctly concluded that International Paint's offers of judgment were enforceable.") (citing *Diamond Aircraft,* 107 So.3d at 373–76; *Yacht Club,* 599 Fed. Appx. at 883).

For the reasons discussed above, the Court will vacate the Bankruptcy Court's Order denying the Investors' motion for entitlement to attorney's fees and costs (which was incorporated in the Amended Final Judgment) and remand for a determination of whether the Investors are entitled to recovery of their fees and costs in light of the fact that *Diamond Aircraft* does not, as a matter of law, foreclose plaintiffs from receiving fees under Fla. Stat. § 768.79 when claims for equitable relief and money damages are brought in the same complaint.

---

applying section 768.79 when the offer or demand for judgment is directed only to the damages claim").

## CONCLUSION

For the reasons set forth in this Order, the Amended Final Judgment of the Bankruptcy Court is **AFFIRMED in part, VACATED in part**, and **REMANDED** for further proceedings consistent with this Order.

On remand, the Bankruptcy Court should: (1) determine the proper amount of damages owed to Palm Avenue based on Count 20 (breach of statutory fiduciary duty) and Count 21 (usurpation of corporate opportunity); (2) issue new findings of fact and conclusions of law on Count 1 (the breach of fiduciary duty claim)—specifically, as to whether sufficient evidence was presented at trial to establish that Leiter accepted the trust imposed in him by the Investors; and (3) reconsider whether the Investors are entitled to attorney's fees under Florida's offer-of-judgment statute, considering the "true relief" test and other authority discussed in this order. The Bankruptcy Court shall conduct any necessary proceedings to make these findings and issue an amended final judgment.

The Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on April 28, 2025.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record